IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


**FRANCES LORETTA WARD,**

      **Plaintiff,**

vs.                                           **CASE NO. 1:06cv171-MP/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. LOC. R. 72.2(D). It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

On January 29, 1998, Plaintiff, Frances Loretta Ward, applied for supplemental security income benefits, with a protective filing date of December 1, 1997. Doc. 16, p. 12; doc. 21, p. 2. The subsequent history, including three administrative hearings, is recounted in Plaintiff's memorandum. Doc. 16, pp. 12-13. The most recent

administrative decision denying her claim, which is also the final decision to be reviewed by this court, is dated September 24, 2004. *Id.*, at 13; R. 24-32. Plaintiff was 56 years old at the time of the last administrative decision, had nineteen years of education, including a master's degree with specialized training in mental health counseling, and had past relevant work as a clinical and an addictions therapist.

Plaintiff alleges disability primarily due to pain (in her head, neck, back, left hip, and left leg), and depression. The Administrative Law Judge found at step two that Plaintiff's depression was not a "severe" impairment. R. 29 (finding that Plaintiff's chronic lumbar strain was a "severe" impairment, but finding no other such impairments). He found further that Plaintiff had the residual functional capacity to frequently lift and carry 20 pounds, sit, walk, and stand without restrictions, and had no significant mental limitations except only a fair ability to travel in unfamiliar places or use public transportation. Finding that she could still do her past relevant work as a clinical therapist, the ALJ found that Plaintiff was not disabled as defined by Social Security law through the date of the decision, September 24, 2004.

Plaintiff asserts that remand is needed because the Administrative Law Judge erred in failing to consider her mental impairment (depression) a severe impairment at step 2 of the analysis. Plaintiff makes subsidiary claims related to this primary claim.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

> The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):
>
> 1. Is the individual currently engaged in substantial gainful activity?
>
> 2. Does the individual have any severe impairments?
>
> 3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?
>
> 4. Does the individual have any impairments which prevent past relevant work?
>
> 5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Legal Analysis**[1]

**Whether the ALJ erred by failing to find that Plaintiff's depression was a "severe" impairment at step 2**

At step 2, the issue is whether Plaintiff has shown that she has a condition which has more than "a minimal effect on her ability to: walk, stand, sit, lift, push, pull, reach, carry, or handle, etc." Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521). "In other words, the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

"[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986), *citing* Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274. "Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected. The claimant's burden at step two is mild." McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying Brady). A "severe impairment" is a "de minimis requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw. Only the PDR 2005 and earlier are available to the court. Medical terms come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at: http://www.mercksource.com (Medical Dictionary link).

from working." Stratton v. Bowen, 827 F.2d 1447, 1452 n.9 (11th Cir. 1987), *quoting* Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985). It also has been characterized by the Supreme Court as a criterion which identifies "at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education and experience were taken into consideration." *Id.*, *quoting* Bowen v. Yuckert, 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

On March 8, 1996, Plaintiff was examined by Michael Amiel, M.D., a psychiatrist, on a consultative basis. R. 200-205. Plaintiff said that since her work related accident on September 2, 1994, she had experienced "a certain sense of helplessness, a decrease in 'mind strength,' decreased concentration, a certain sense of 'spaciness in her head', fatigue, blurry vision, decreased energy and variable mood which fluctuates with her pain." R. 200. She reported to Dr. Amiel that she "enjoys gardening, walking, movies, dinner, and has maintained a fairly active lifestyle in the context of unemployment." *Id*. She "denied being depressed more days than not during the last year and a half." *Id*. Plaintiff reported that during the day, she would talk with half a dozen friends on the telephone, shop, run errands, go to the movies, take care of her worker's compensation business, and attend doctor's appointments. R. 203. She expressed a level of depression of three or four on a scale of ten. *Id*. Dr. Amiel's "impression" was that Plaintiff had

> a mild mood disturbance as well as occasional anxious mood in the context of her physical complaints. Medical documentation suggests an exaggeration of symptoms consistent with a certain degree of underlying anger which the patient could possibly process further with additional individual therapy . . . .

Case No. 1:06cv171-MP/WCS

R. 205. The Axis I diagnosis was depressive disorder NOS (not otherwise specified). *Id.* On Axis V,[2] Dr. Amiel assigned a GAF (Global Assessment of Functioning) score of 70. *Id.* "The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.' *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)." Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002). A GAF score of 61-70 reflects mild symptoms or "some difficulty" in social, occupational, or school functioning, but the individual "generally function[s] pretty well." Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

Plaintiff began mental health treatment by Ramon Enrique Pino, M.D., a psychiatrist, on September 16, 1997. R. 345. Plaintiff reported that she had not worked steadily since an accident in 1994, and said she suffered from chronic pain syndrome and depressive mood disorder. *Id.* She said she needed medications. *Id.* Dr. Pino found Plaintiff to be preoccupied with legal and work-related issues, anxiety and depression, pain, dizziness, nausea, vertigo, and vomiting. *Id.* His diagnosis was major depression with anxiety. *Id.* On Axis V he assigned GAF score of 41.

> GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 663 n.2 (8th Cir. 2003). Prozac was prescribed by Dr. Pino. *Id.*

---

[2] Axis V of the DSM-IV Multiaxial System is explained at: http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

Dr. Pino treated Plaintiff fifteen times, on October 2, 1997, October 24, 1997, October 31, 1997, November 21, 1997, December 2, 1997, December 12, 1997, December 26, 1997, December 30, 1997, February 6, 1998, March 6, 1998, March 20, 1998, April 8, 1998, April 16, 1998, April 21, 1998, and April 29, 1998, making identical findings. R. 327-344. Indeed, the lengthy notes are almost verbatim for each session. On February 6, 1998, however, Dr. Pino added a new passage, a "case summary and formulation." R. 336. In the "case summary and formulation" section he said that Plaintiff had

> significant profound psychologic and social impairment marked by depressed affect and a virtual lack of function. The prognosis is guarded because of the excessive chronicity, morbidity due to chronic pain syndrome with psychological complications and the severity of the depression.

*Id*. This summary, like the other notes, remained unchanged for all of the subsequent visits.

On August 3, 2000, Dr. Pino completed a medical source statement concerning Plaintiff's mental impairment. R. 411-412. He said that he thought that Plaintiff's ability to perform activities within a schedule, maintain regular attendance, be punctual, sustain an ordinary routine without special supervision, work with or near others without being distracted by them, complete a normal workday or workweek, or perform at a consistent pace, was poor, defined as no useful ability to function. R. 411. He also said that Plaintiff had poor ability to get along with co-workers and peers, or travel in unfamiliar places or use public transportation. R. 412. He said that the medical findings supportive of this opinion were Plaintiff's depression and pain. R. 411-412.

On September 19, 2000, Dr. Amiel again examined Plaintiff on a consultative basis. R. 368-374. Plaintiff reported experiencing a depressed mood at a level of eight and one-half on a scale of ten. R. 368. She reported feelings of hopelessness and impairment of memory and concentration. *Id.* Plaintiff said that she enjoyed gardening and reading, and was able to concentrate to watch television when a program interested her. *Id.* She related her depression to her physical condition. *Id.* She was taking Paxil[3] among other medications, including hydrocodone[4] for pain. *Id.* She reported being depressed for several days, but denied any acute mood disturbance for two weeks or longer. R. 369. She said she had been sent to Dr. Pino by the Division of Vocational Rehabilitation for group therapy, and therapy had helped her deal with pain. *Id.* She reported that Prozac had been ineffective. *Id.* She had been told by another psychiatrist, Dr. Wear, that she did not qualify for his study because she suffered from dysthymia[5] rather than major depressive disorder. *Id.* Plaintiff said she lived alone, but had several friends. R. 370. For the prior 18 months, she had been leading a bible study group once a week, and she reported that in May, 1999, she had become an

---

[3] An antidepressant. Physicians' Desk Reference (2004), p. 1583.

[4] Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY. In its various forms, including Lortab, hydrocodone is used to treat severe pain. Dyer v. Barnhart, *supra*, 2005 WL 18604, *5.

[5] Dysthymia (a dysthymic disorder), according to the DSM-IV, is a mood disorder characterized by depressed feelings (sad, blue, low), loss of interest or pleasure in one's usual activities, and by at least some of the following: altered appetite, disturbed sleep patterns, lack of energy, low self esteem, poor concentration or decision-making skills, and feelings of hopelessness. The diagnosis describes symptoms that have persisted for more than two years but are not severe enough to meet the criteria for major depressive disorder. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

ordained minister in the Alliance of Divine Life Church.  *Id*.  She said that she was a master gardener and worked as a master gardener about 50 hours per year.  *Id*.

Plaintiff told Dr. Amiel that she had stopped seeing Dr. Jones (physical care) due to financial expense, but did not mention financial expense as the reason she was not seeing Dr. Pino.  R. 369.  She said she was "aware of the We Care Program and the community mental health center concerning her mental health needs but has yet to proceed towards those agencies."  R. 371.  It is reasonable to infer that these agencies are available in Plaintiff's community to provide health care for those who cannot afford to pay.

In describing her daily activities, Plaintiff told Dr. Amiel that she would awake at 10:30 a.m., eat breakfast, feed her cat and birds, and vacuum.  R. 371.  She washes the dishes, does the laundry, and does a little cooking, but refrains from bathroom work.  *Id*.  She said she gardens on a daily basis and goes grocery shopping.  *Id*.  She skims the newspaper, and is able to follow the content of her reading.  *Id*.  Plaintiff said that she took a nap from 2:00 p.m. to 4:00 p.m. daily.  *Id*.  She socialized with friends one or two hours per day, particularly by telephone, and talked daily with her mother.  *Id*.  Plaintiff said she reads in the evening, and goes to bed each night between 12:00 a.m. and 2:00 a.m.  *Id*.  She said that she had a valid driver's license.  *Id*.

Dr. Amiel reviewed his own prior record from 1996 and the treatment records of Dr. Pino.  R. 272.  He noted "no major improvement in her mental condition over time despite medication treatment and group therapy [with Dr. Pino]."  R. 372-373.  He said that excessive sleep and weight gain were associated with her mood disturbance.  R. 373.  His impression was a mood disorder.  *Id*.  He thought that she was "partially

compromised" for work activities by her mental condition, and felt that her prognosis was guarded due to the chronicity of her symptoms.  *Id.*  He again found depressive disorder not otherwise specified on Axis I and a current GAF of 60 on Axis V.  *Id.*

Dr. Amiel then filled out a "medical source statement of ability to do work-related activities (mental)."  R. 375.  He found Plaintiff's ability for understanding and remembering detailed instructions, carrying out a detailed instruction, maintaining attention and concentration for extended periods, and performing activities within a schedule, maintaining regular attendance, and being punctual, to be only fair, defined as able to perform the activity satisfactorily some of the time.  R. 375.  He likewise found Plaintiff to have only a fair ability to perform at a consistent pace, to complete a normal workday or workweek, to interact appropriately with the public, to accept instructions and to respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, and to travel in unfamiliar places or to use public transportation.  R. 373-376.

Umesh M. Mhatre, M.D., a psychiatrist, examined Plaintiff on a consultative basis on December 9, 2000.  R. 386-391.  He also reviewed the reports by Dr. Pino.  R. 386.  Dr. Mhatre said that Plaintiff stopped seeing Dr. Pino for financial reasons.  R. 388.  Dr. Mhatre noted that Plaintiff said that she arose at 9:30 a.m., took care of her animals (two birds and a cat), read the newspaper, did housework, ate lunch at about noon, paid bills, talked with friends on the telephone, watered her garden, cooked supper, and usually visited her mother, but occasionally visited a friend.  R. 388.  She said that she went to bed at 11:00 p.m.  *Id.*  She reported that she did not regularly drive.  *Id.*  Her current hobbies consisted of reading, gardening, and church activities.  *Id.*  She spent

about 60 hours a year as a volunteer for Master Gardeners, helping and teaching other people about gardening. *Id.*

Upon examination, Dr. Mhatre found that Plaintiff did not appear to be in any physical discomfort throughout the interview. R. 389. He found her gait and posture to be normal. *Id.* He determined that her mood was only slightly depressed, and her affect was appropriate. *Id.* His diagnosis was dysthymia, chronic pain, and stress related to lack of a job and financial difficulties. *Id.* He assigned a GAF score of 65.

Dr. Mhatre also filled out the same check list, "medical source statement of ability to do work-related activities (mental)." He found Plaintiff's abilities to be either good or excellent in all categories except ability to travel in unfamiliar places or use public transportation, which he found to be fair. R. 390-391. Excellent meant that the ability was not limited, and good meant that the person could perform the activity satisfactorily most of the time. R. 390.

The administrative hearing was held on June 14, 2004. R. 525. Plaintiff testified at the administrative hearing that she does not do much cooking and does household cleaning in stages, resting in between. R. 538. She said that she does grocery shopping, not mentioning any limitations. *Id.* She said that a friend helps with vacuuming, moping, dusting, and mowing the lawn. *Id.* and R. 539. She acknowledged that she had friends come to visit and occasionally goes out to meals with friends and to church. R. 539. With respect to depression, Plaintiff said that it was depressing to have been impaired for so long. R. 540. She said that she had a feeling of hopelessness. R. 534. Most of her testimony, however, concerned the degree of pain that she experiences rather than her experience of depression. R. 534-537.

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Generally, a treating physician's medical opinion is entitled to greater weight than the opinion of a consulting physician. Wilson v. Heckler, 734 F.2d 513, 516 (11th Cir. 1984).[6] The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence. Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992). There is good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004).

The Administrative Law Judge found that Plaintiff's "affective disorder is not severe and results in minimal mental functional limitations; that is, the claimant demonstrates only mild restriction in activities of daily living and only mild difficulties in social functioning or maintaining concentration, persistence or pace." R. 29-30. The ALJ gave the following reasons to discount Dr. Pino's opinion (and the consultative opinion of Dr. Amiel):

---

[6] A consultative examination, that is, a one-time examination by a physician who is not a treating physician, need not be given deference by the Commissioner. McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987). A residual functional capacity assessment by a consulting physician can be substantial evidence to support a hypothetical to a vocational expert. Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir. 2002). There is contrary authority, however. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998) ("opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.").

> The record has shown that the claimant studied and became an ordained minister in 1999 while she was pursuing her disability claim. She does household chores, cares for her animals, reads, is active in her church, visits relatives and friends, and drives. This finding is also essentially consistent with the opinion of Dr. Mhatre who indicated that the claimant's dysthymia and GAF of 65 results in minimal functional limitations. Great weight has been accorded to Dr. Mhatre's assessment, as his clinical findings were based on objective criteria, including a notation that the claimant was only slightly depressed, had no flight of ideas, and normal cognitive functioning. Based on his clinical findings, Dr. Mhatre found "excellent" to "good" abilities in all measured areas, with the exception that the claimant demonstrates a "fair" ability to travel in unfamiliar places or use public transportation. Dr. Pino's assessment is accorded lesser weight as he last saw the claimant in 1998 and his August 2000 assessment is not supported by any current evidence. Additionally, his progress notes reflect only a statement of subjective complaints from the claimant and no diagnostic testing. The same is true of Dr. Amiel's assessment. Thus, it too has been accorded little weight.

R. 30.

These findings are supported by substantial evidence in the record discussed above. In particular, the ALJ's findings as to the extent of Plaintiff's daily activities are fully supported by Plaintiff's own report to Drs. Amiel and Mhatre of her daily activities. An ability to read, talk and visit with friends, and do some household chores is significantly inconsistent with Dr. Pino's findings. The GAF scores assigned by Drs. Amiel and Mhatre are additional evidence that Plaintiff's depression had only minimal or mild effects upon her ability to work. Further, there is evidence, again as reported by Plaintiff, that she was able to become an ordained minister in 1999. Dr. Pino, however, last saw Plaintiff on April 29, 1998, and did not prepare his residual functional capacity opinion until August, 2000. Dr. Pino's treatment notes, while lengthy, did not change much at all over the period of treatment. For example, the GAF score of 41 remained the same, a suspicious fact giving rise to an inference of inattention on the part of Dr.

Pino since it would reasonably be expected that Plaintiff's level of functioning would have varied over this period of treatment.  Finally, Plaintiff did not continue mental health treatment with Dr. Pino or with any other mental health care provider after April 29, 1998, to the date of the hearing, on June 14, 2004.  Even if Plaintiff could not afford to continue treatment with Dr. Pino, a proposition for which there is little evidence in the record, there is no evidence in the record that Plaintiff could not have found free mental health care in her community.  The ALJ followed the law governing step 2 analysis and the weight to be given to the opinion of a treating physician, and his reasons for discounting Dr. Pino's opinion are supported by substantial evidence in the record.

### Whether the ALJ erred in failing to consider Plaintiff's non-exertional mental health problems in combination with other impairments

Impairments must be evaluated in combination when determining whether an impairment meets or equals a listed impairment at step 3, a claimant's ability to do past relevant work, other work, or a claimant's residual functional capacity.  Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990); Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990); Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  Impairments must be evaluated in combination even though some impairments are not severe. Hudson v. Heckler, 755 F.2d 781, 785 and n. 2 (11th Cir. 1985).  The Eleventh Circuit has "repeatedly held that an ALJ must make specific and well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled."  Davis v. Shalala, 985 F.2d at 534.

The ALJ properly found that Plaintiff did not have a severe mental impairment and relied upon the findings of Dr. Mhatre.  Dr. Mhatre's opinion is substantial evidence

in the record to support a conclusion that Plaintiff's depression would not have had much of an effect upon her capacity to work, whether considered at step 3, 4, or 5.  The ALJ did not improperly fail to consider Plaintiff's depression when conducting the evaluations at all steps after step 2.

**Whether the ALJ ignored the remand by the Appeals Council**

On June 23, 2000, the Appeals Council remanded for the ALJ to reconsider the opinion of Dr. Pino, and to determine at step 2 whether Plaintiff had a "severe" mental impairment, that is, depression.  R. 96.  It was suggested that the ALJ might obtain additional evidence from Dr. Pino, and enlist the help of Plaintiff's representative to obtain such evidence.  R. 97.  A remand also was ordered to obtain "a consultative psychiatric examination."  *Id.*  Plaintiff contends that the administrative decision of June 25, 2002, failed to abide by this order on remand.  Doc. 16, p. 19, citing R. 79.  That administration decision is found in the record at R. 61-83.

The administrative decision under review is the one rendered on September 24, 2004, R. 24-32, not the decision of June 25, 2002.  The remand of September 26, 2003, vacated the decision of June 25, 2002, because the hearing tape of the administrative hearing that resulted in that decision could not be found.  R. 101.  The remand was simply to hold another hearing.  *Id.*  Plaintiff elected to attend the last administrative hearing on June 14, 2004, without a lawyer, even though she had previously been represented by an attorney.  R. 525.  If there was a need for additional evidence from Dr. Pino, Plaintiff could have sought it at that time.  It is doubtful that Dr. Pino, however, would have been able to provide anything further in 2004.  He had not seen Plaintiff since April, 1998.  Further, the record did contain the consultative examinations of Drs.

Amiel and Mhatre, as ordered by the Appeals Council in the June, 2002, remand.  The ALJ did not fail to follow a remand order of the Appeals Council.

### Whether substantial evidence supports the decision at step 4 that Plaintiff is able to perform substantial gainful activity

The only evidence argued in support of this claim is the evidence from Dr. Pino concerning Plaintiff's depression.  Doc. 16, pp. 21-25.  This evidence has been fully discussed above.  It was not error to discount Dr. Pino's treatment notes and opinion for the reasons discussed above.

### Conclusion

Thus, considering the record as a whole, the findings of the Administrative Law Judge correctly followed the law and are based upon substantial evidence in the record.  Accordingly, the decision of the Commissioner should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on October 1, 2007.

> s/    William C. Sherrill, Jr.
> **WILLIAM C. SHERRILL, JR.**
> **UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 1:06cv171-MP/WCS